Good morning, Your Honors, and may it please the Court. Brian P. O'Connell on behalf of the appellants. If it's okay, I would like to reserve three minutes for rebuttal. Thank you. Your Honors, plaintiffs have brought a strong, well-pled case against a drug company, then known as Acceler-X, now known as Talphera, that touted its only approved product, Dasuvia, a painkiller 10 times the strength of fentanyl and 500 times the strength of morphine, as a simple-to-administer, tongue-in-dung process, while omitting clear steps, dosage information, and information on Dasuvia that were all required under the company's REMS, Risk Evaluation and Mitigation Strategy, for which the FDA conditioned its approval of the drug. The drug was only approved after the REMS program was submitted five different times. As alleged in the complaint, the REMS is a rare program that applies only to dangerous substances and when there presents safety concerns. Acceler-X was approved for marketing only consistent with these specified REMS instructions. Downplaying or omitting REMS in promotional materials is unlawful and has historically triggered the issuance of FDA warning letters. By touting the drug as tongue-in-dung to investors and medical professionals, the drug was misbranded under Section 352A1 of the Federal Food, Drug, and Cosmetic Act, FD&C. Defendants made these tongue-in-dung statements to assure investors that the total addressable market for Dasuvia was, in fact, larger than it was. Acceler-X's misleading description of Dasuvia's administration was consistent with Engadi's aim, Defendant Engadi, the CEO, of expanding Dasuvia's market to include settings where monitoring was less restrictive. This was done while defendants simultaneously marketed Dasuvia outside the context of emergency medical centers. Just before the class period began, a regional medical director at the company warned the CEO, Vince Engadi, and the chief medical officer, Pamela Palmer, that the tongue-in-dung campaign was misleading and could subject them to FDA punishment. Numerous former employees corroborated this director's concern, as multiple former employees refused to deploy. They said they were told it was misleading, not that it was false, right? Um, they were told that it was misleading and could subject them to an FDA warning letter, specifically. This was the regional medical director who presented this information to Palmer, first in private, and then at a meeting later that day, both to Palmer and Engadi. The one thing I'm struggling with your argument here is, if this were just a household item, and we were applying a reasonable consumer standard, I think you might have a better case. Because we assume reasonable consumer picks up an item on the store shelf, looks at it for two, three seconds, something on the box, and believes it and, you know, puts in the shopping cart. But here we're talking about a reasonable investor standard, much more sophisticated. So, I mean, the slogan, tongue-in-dung, clearly that's kind of a cute little catchphrase. But, I mean, you wouldn't expect an investor just to look at that and then make all these assumptions. And before they invest money, they'll look at all the context, do a little bit more due diligence. So, I mean, the tongue-in-dung isolation, maybe it's misleading, but I think we, you know, have to look at the broader context for a reasonable investor. Sure. And, Your Honor, one example would be the Oppenheimer Conference, which was March 20th, 2019, when Engadi gave a talk about the administration of the use, and he parroted this tongue-in-dung language to the investor. He said, I might be misquoting it slightly, but it's in the record. He said, you lift up your tongue, you inject it, and then you're done. It's as simple as that. But didn't he also have caveats of things like, these will not be sold in stores, these will be provided, there's a, you know, maybe not all the caveats he wanted, but he did provide additional context to that. Well, Your Honor, he did have a, he had an opening statement that was, as you probably know, was separated by at least three pages of verbal text between that, talking about, you won't find the, I think it was like, you won't find these sold at Rite Aid. But he didn't go through all the steps that were required under the REMS, or disclose the maximum dosage, or frankly, he didn't disclose that the company was undergoing this risky marketing campaign that was going to subject them to a FDA scrutiny. One other thing that's... Risky. Where are the facts on that? In the record. Sure. The company was required to submit the marketing materials to the Office of Prescription Drug Promotion. They waited for a full year to do that. They instead simply started marketing this tongue and dung campaign to investors. So... Why was that risky? Because they were required to submit these materials. So, for them to have this REMS program where they have five different rounds of going back and forth, and here's what you need to do to have this limited approval, and you're going to be responsible for monitoring and compliance. Um, for them to just turn right around and not tell the FDA and go about this, this tongue and dung campaign, while simultaneously telling investors that they were subject to the REMS, and they had to, they had to make these, they had to comply with the REMS, but then, in fact, they, they were skirting it. So, that's, that's where the risk comes from, Your Honor. But it was clear that they never said that they didn't have to comply with their risk evaluation mitigation strategy. There's nothing there that, where they said, no, we don't have a risk evaluation mitigation strategy that we must comply with. No, and it's, it was, it was actually the, it was kind of the opposite, where they, they told the, they told investors they had this strategy, and they made it sound like they were, they were complying with their, with their labeling restrictions. But, in fact, this tongue and dung slogan was being marketed to tens of thousands of medical professionals at the same time. But it include the, the REMS requirement? Uh, it included a, the, the banner included a reference in, in smaller font to, to the restrictions of use. However, the tabletop display, uh, you know, you can see it in the there's, there's an illusion to, you know, see the booth for more, but. But it, the group that was, this was presented to was, in fact, healthcare providers. So, they would know essentially what the REMS is, right? Um, it was. They'd have to maybe look at it, and, but they know what it is. Right, but the, but the, you know, the, the FDA letter, you know, it held that, that, that this, this marketing campaign was not, was not sufficient. So, yes, it was marketed to healthcare providers as opposed to, you know, a consumer who looks at a box once. I think that was Judge Lee's analogy. But the fact that it was, it was marketed to healthcare providers didn't, didn't obviate them of their need to be fully, to fully disclose all the risks that were, that were part of this, quite frankly, extremely serious drug. So, and those risks would have been, what should they have done? Um. What should they have disclosed? Yes. In particular, that was, that was essentially illegal under the securities exchange law. Yeah. So, I think it's a, I think that's a bit of a two-part question. I'll try to get to both of them quickly. When, when, when we're talking about just the misbranding materials, I would say that it would, that, that certainly the maximum dosing was, was, was not disclosed. The. Never? You're saying it never was disclosed? It wasn't, it wasn't disclosed in the, in the, in the tabletop display or the, or the banner ad. Um. So, this was being disseminated to the, to medical professionals and they, and they, they weren't receiving this full information, which is why they ultimately got the, the warning letter. Um. And then, uh, so maximum dosing, and there was also an instruction that the FDA came down on them for, for not, um, for not providing the, um, the full, um, in addition to the dosing information that the, that the, the drug had been visually, visually confirmed to be placed in the right spot. Um. So, that's, that's for the misbranding part. For the, for the Oppenheimer statements, I would say that, that Angadi would have, he also, if he, if he was going to tout the, if he was going to parrot the tongue-in-tongue language, which he didn't have to, but once he did that, he had an opportunity, he had an obligation to do so, uh, truthfully. So, what I would say he should have done was, uh, fully identify that, that, that they were, uh, doing this simplistic marketing campaign, uh, without, without previously submitting it to the FDA, as had been required. So, I think. Before you sit down, would you address the answer? Oh, absolutely. Um, I, I would just say. Would you agree first that your argument is inferential? Um. I mean, that, that's what you say in your brief. Sure. Uh, the, I, I would say that there, there's a, between, this was a small company, Your Honor, the, um, very tiny, one product. We have, we have, the complaint has allegations from 12 former employees, including the one I disclosed, I discussed earlier, who warned the CEO, uh, and Chief Medical Officer specifically. Numerous CWs corroborate, uh, these allegations, and, and there was widespread discomfort with using the slogan, uh, employees flipping over the, flipping over the, the display because they were embarrassed. Um, the, the other part of this is, uh, we don't, we didn't, we didn't allege that Scientra was, was purely on core operations doctrine, but if there's one case that would, that would support it, it's this. This was a tiny drug company. Uh, all its revenue was from DeSuvia. Um, for defendants to not know that their statements were misleading when made, especially that they... So again, I, I just want to make sure. It's an inference that you're arguing, and Tell-Ab said it has to be a compelling inference, not just plausible or reasonable. So how do you get there? Well, I would say that, I would say it's compelling when, when a, uh, when a medical director, a regional medical director who, uh, reports to someone on the Promotional Review Committee warns the, warns the, uh, the individual defendants that they're, that they're going to get a warning letter. And then also there's, you know, a significant percentage of the company not only embarrassed to use the slogan, but, uh, informing, informing us during our, our investigation that they were embarrassed to use the slogan. Um, and this, the defendants held themselves out as that they would, that they would, uh, comply. They would have these, all, all these internal controls. Uh, and then they just didn't. They, and they didn't submit the, they didn't submit these, these marketing materials, uh, for a year after, after it was approved, after the drug was approved. And then, um, frankly, afterwards, the, afterwards the, the warning letter came. They didn't disclose the, the, the FDA punishment for five days. Um, so they covered it up on the front end. They covered it up on the back end and they deliberately recklessly used a misleading slogan. Thank you. Thank you.  All right. Um, good morning and may it please the court. Uh, Patrick Hayden on behalf of Appellees. So I know we just heard a lot of information from the other side, um, but at its core, this case is about Accelerex's attempt to predict how the FDA would view advertisements for its new drug, Dysuvia, under the agency's rules for promotional materials. That meant asking what the FDA would think about everything from these materials, use of colorful graphics, to the level of detail they provided about the drug. Now to answer these questions, the company assembled a group of in-house experts, and it's called the Promotional Review Committee, whose job it was to review these materials for FDA compliance. According to the complaint, this committee interacted directly with the, with the FDA, conducted, conducted its review and signed off on the materials. Now it turned out that the FDA issued, uh, reached a different conclusion and issued the warning letter that plaintiffs have used as the basis for this lawsuit. But we think plaintiff's allegations in this case just do not amount to securities fraud. So what should we do with the FDA warning letter? FDA, you know, believed that this could potentially mislead people and, and by that, over medical professionals, because this isn't being sold over the counter. So if the FDA thinks that, you know, these statements could potentially mislead a medical professional, I mean, is it fair to say that it could mislead a reasonable investor? Yeah, I appreciate the question. And I think the answer sort of goes to a point that you made, Judge Lee, earlier, which is about who is the viewer. And here we are talking about, about the investor. And the FDA is applying agency-specific rules that sound much more in, in sort of consumer protection in how it assesses branding and promotional materials. So there are different standards. And I think this case is an excellent illustration of the difference between what might be sort of a consumer protection issue on the one hand, and what would be securities fraud. So what's the FDA standard for issuing warning letters? I mean, it's not, is it, especially if it's not over the counter, it's not as, it's, it's not a reasonable consumer standard, is it? So, so you'd want to go to 21 CFR 202.1. That lays out some of the standards. And I think what the, what the FDA would look to are things like the layout, the topography, the typography, and the like, and the materials. They're looking to, to other information as well. But what you see in this case, what do they say is misleading? One great illustration is on that, the website banner. The problem the FDA had is that you had to scroll down the webpage to see some more detailed information about the drug. Now, reasonable investors, sophisticated investors, scroll down webpages all day. We expect them to. Under the Supreme Court's decision in Omnicare, we know they have to read the fine print, the hedges, the disclaimers, and the like. So we apply a very different standard in asking what might mislead a reasonable investor versus sort of a consumer or, here, a medical provider. And, and, you know, while I don't need to expand on the point, I would just note that the Supreme Court has recognized this distinction between how the FDA assesses warning and branding and other legal regimes. And I would point you to Wyeth versus Levine. That's 555 U.S. 555 from 2009. Of course, it's not in the briefs. You know, I don't think we've all expanded on this issue. But it sort of recognizes that what the FDA might say about misbranding is not going to control in sort of in a parallel action assessing the same materials. Now, now, I'd like to move to Sienter, sort of where Judge Thomas was at the end of the discussion, because that was the basis for the district court's dismissal. And as we outlined in our brief, plaintiffs are attempting to plead Sienter really on the basis of former employees. We discussed all of them in our brief, but I think I will jump ahead to FE7. That is the regional medical director that you heard our friend speak so much about. And just to level set for the discussion, I think it's really helpful to look at what FE7 allegedly told Dr. Palmer or Aunt Mr. Angadi about his views on these promotional campaigns. And just as a reminder, this is the only allegation plaintiffs have of any allegedly adverse negative information getting to the individual defendants. And what FE7 says, and I'm talking about ER83, you know, paragraph 115, he says this company is at risk of an FDA warning letter. That's it, a disclosure to those defendants that you're at risk. I think, you know, as we explained in our brief, these defendants knew there was a risk. It's an ever-present risk as you go out to promote a drug. So he didn't tell them anything new. But I think if you gave FE7 every benefit of the doubt, what FE7 might have meant to convey is, look, this risk is more serious. This is more acute. And I think if you sort of go there with FE7, you are squarely within the realm of the kind of internal disagreement or debate on a question of degree. Just how likely is the FDA to issue a warning letter? And this complaint tells us the information these individual defendants are getting. They have that promotional review committee. It lays out in the complaint. It has the top two lawyers at the company, the top three medical professionals. They're communicating with the FDA. And they advise these executives that these materials do comply. So I think when we look at FE7 maybe implying that the risk is more acute and then, you know, sort of the other information these executives are getting, I don't think you're going to get to that strong inference of Sienter. And the second sort of related point about FE7, which we see the district court recognize, is that I don't think you can walk away with any inference from this complaint that either or Dr. Pomer agreed with any more serious concerns that FE7 may have meant to convey. This complaint tells us how they react. They say this is a marketing decision. And that made a lot of sense as a practical matter. FE7 had just joined this company. He works at a regional office in medical affairs, but not related to regulatory issues or marketing or promotional materials and the like. And although FE7 might not have known it, those professionals are actively working on this regulatory question. They're weighing in. And at the same time, this complaint shows us every single marketing professional at this company, they're all former employees. It's FE1 and FE4. FE3 is also working with the company. No concerns, no negative information passed along to any individual defendant. So I think the district court was right there to sort of recognize that despite what FE7 said, we sort of can't draw the inference that these executives walked away believing anything they said was misleading. And the last thing I'll say about FE7 before moving on is there's, of course, a timing problem. You see that discussed in our brief. And we believe it is well-supported in Ninth Circuit precedent. But it is not dispositive here. And I think one way to look at it is just sort of it confirms the weakness of the FE7 allegations. And that would be the way this court looked at the issue in Webb. And footnote one of that decision in Judge Lee's decision in Protonova is sort of another way to sort of look at that sort of timing issues with former employee allegations. And can you address your friend on the other side's argument about the core operation theory? He says it might apply with more force when it involves a smaller company. And Telfair isn't Pfizer or GSK with thousands of employees here. Maybe you can infer a little bit more when you have such a small company, tight-knit company. Right. So I want to be clear. I think there are actually sort of two different concepts. One, which you talk about, which our friend talks about sort of the size of the company, that is not core operations. It's just another way of maybe thinking about other potential inferences of Sienter. And I think this court has really rejected the idea that being a small company involving a key product, that that's enough to raise the strong inference of Sienter. I believe we addressed this in our brief, but key cases might be the first NVIDIA decision that's in 2014. That's where this court considered a claim that it was the company's flagship product. And this court was clear. That's not enough. I think we also talk about Metzler, the claim it's a small company. Everybody talks. You hear a lot of securities cases involving small companies. The size of the company, again, is not going to be enough to get you to Sienter. And I do want to— Does it make it easier, do you think, at least? I mean, the size itself isn't dispositive. But at least, does it make it easier to show that? I'm reluctant to say it would make it easier, judgely. I think it's certainly a different fact pattern. I think in all of these cases, regardless of the company size, you often sort of look to the information that that executive gets and whether it would conflict with sort of the information they receive. So in some of your cases, which I'm happy to discuss, that would include cases at our friends' site, like Forescout Technologies, Quality Systems, and the like. Those are big companies, but they have sort of that robust information system that is getting the data to the executives every minute. You know, they're meticulously reviewing it constantly. So I think that despite the size there, you can sort of understand how the information would get to a defendant who might say something different to the market. I do want to get back to your question about co-operations, because we heard our friend raise it. As I think we explained in a brief, it's a very difficult standard to meet. And the two requirements are, of course, that we look for usually representations of actual access to data. So, you know, for example, in the Reese versus Malone, you have an executive—this involves the BP oil spill—and, you know, an executive who's a chief engineer says, I see all of the data. I have all the numbers on, you know, how this pipe is corroding and the like. That's how you could, you know, sort of get to those representations. Nothing of the sort here. I think the closest our friends say is, Dr. Palmer says, we review these materials carefully. You know, we see that sort of representation from companies every day. And it was, you know, of course, true. This company was looking at these materials. So I don't think that will get them there in terms of representations about access. And then the other, you know, and often the focus is really on the absurdity prong. I don't think that theory works here, that it would be absurd for people not to know that this was a misbranding. In fact, you know, we see a difference of opinion here, even within this company. We look to the allegations. Again, I would commend you to look to all of the allegations of the marketing professionals. They did identify some of the relevant people. Again, it's FE1, FE4, and FE3. Those are the folks in the position to know. And you won't hear them say anything negative about these materials. So I think when you look at this complaint holistically, you just don't sort of have that absurdity element satisfied either. Now, I do. I'm happy to move to falsity as well. But I would also like to quickly address a couple of the points that we heard our friends on the other side mention. The first is the REMS. It is, I think the REMS, you know, is a bit of a distraction in a way. And I want to explain what the REMS is actually about. Because it does not govern, in the case of DeSuvia, marketing or promotional materials. I think as you read it, it's at SCR 15 to 26. It is about distribution, both to medical facilities that are going to be sort of dispensing this drug, and to wholesalers who are going to sell it on to others. And it imposes a number of procedural requirements on those third parties. So for example, if you're a wholesaler, you have to, you know, maintain and submit records. You kind of have to do audits on how you're shipping the drug. If you're a medical facility, you have to establish a training program and the like. You have to certify certain staff members. So that is what this REMS is about. And then procedurally in this case, and I think we note this in our brief, the district court found that plaintiffs had not alleged any noncompliance with the REMS. I think you see that at ER 24, and we noted in a footnote of our brief. I don't see any challenge to that. So I think for purposes of this case, we take it that compliance with the REMS is essentially undisputed. And then I also just wanted to return to Mr. Angadi's statement at the Oppenheimer Conference. Just because, you know, as I'm sure you noted, Mr. Angadi, you know, did not use the tongue and done slogan at that conference. He's speaking to investors, but you won't hear the slogan, and you don't see him, you know, use any of those promotional materials. I think, you know, plaintiffs have done that quotation mining. You see tongue, and you see you're done. And you certainly see him at a high level describing his company and describing how this drug works. I think that sort of explains what he says. It's, you know, it's basically as simple as that. But I don't think at an investor conference that any CEO would stand up and read a black box warning or instructions for use word for word. I don't think any investor or analyst would expect to hear it. So we think that in context, that statement is both different from the promotional materials that the FDA looked at and not alleged to be false or misleading in context. And if you'd like to hear sort of about falsity, I think that the, you know, one sort of theme that we present as to the promotional materials themselves is, of course, that we are, as Judge Lee noted, sort of looking at it from an investor standpoint. We're putting our investor hat on. This is much more sort of a promotional slogan for consumers, tongue and done. We haven't identified any precedent from this court saying that an advertisement, and certainly not one anywhere close to this sort of high level communication to consumers, is actionable as securities fraud. We discussed LifeLock. I think that's the closest we found. And I know it is unpublished, but it's what we see with the software advertisements that describe it as the company is taking fast action and the like. And I think the panel there was, you know, very quick and decisive in saying that it's not probative of securities fraud. We think that same reasoning controls here. You could also look at the issue as one of puffery. They're somewhat related. Puffery is the label that we would apply in the securities law context. And then finally, you know, if you do choose to sort of go there, you know, tack on this advertisement slogan as something that could be cognizable as securities fraud, we don't think it would be misleading in context. We do see, both with the tablecloth, the tabletop drape, and the website banner, additional detail is available. So if we imagine the hypothetical investor goes to the medical conference and says, oh, I want to learn more about that. That company seems interesting. We will note at ER 88 that you will see that website banner. Again, you've kind of had to scroll down. And then if you see the tablecloth, it says, quote, please see indication, important safety information, including limitations on use, and boxed warning at this booth. So the information was there. We expect investors to do that, their homework. And as I see I'm running out of time, I would just note that page 12 of our brief does identify the additional places where we consistently disclose to investors all of the details on how to use this drug and sort of the limitations that we faced. So with that, we think the district court was right to grant this motion to dismiss after giving plaintiffs four opportunities to state a claim, and we would urge you to  Thank you. Thank you. Thank you, Your Honors. I'll do my best. I've got a minute and 50. So defendant Apelli mentioned that this was not an investor-facing document. I would just, and he alluded to the LifeLock case, I would just point the court to the Carter-Wallace decision that held that statements to sophisticated medical investors, medical professionals are actual under the securities laws. And I would note that basically Levinson holds that the in-connection requirement is to be construed broadly. As to whether or not there were all these other possible disclosures, if you went and looked something up or if you clicked down and looked at some smaller font, I would just point out that the law is well settled, that the adequacy of disclosure goes to the trier effect, and it's not an issue to be decided as a matter of law unless reasonable minds can't differ. That's the price-of-effect case. The one other thing I want to discuss is that Mr. Hayden made some allusions to FE7's concerns being rejected. That, respectfully, that's not entirely accurate. The FE7 first brought his concerns to Gail Rosenspahn, who sits on the promotional review committee, Mr. — and then he spoke with Ms. Palmer, Dr. Palmer, who also said she appreciated his concerns. And then when it was brought to Angotti and Palmer simultaneously, they were dismissive — they were — they didn't disagree. They simply said that it wasn't — that it was a marketing issue. I would point to the case that just came out this week. I think it was Tuesday. The Cardone case that noted that where a company is warned and they don't contest — they don't contest the findings, it can be indicative of subjective falsity. I think I'm out of time, but unless the Court has anything, I appreciate the opportunity to have oral argument. ROTHSTEIN, JR.: Great. Thank you. Thank you both for the helpful argument. The case has been submitted, and we are at recess.
judges: THOMAS, LEE, Silver